## PODOLSKY v. LA FORGE.
### No. 3240.

Circuit Court of Appeals, First Circuit.
Nov. 9, 1937.

George L. Rabb, of Boston, Mass. (Maxwell M. Rabb, of Boston, Mass., on the brief), for appellant.

Edward R. Langenbach, of Boston, Mass. (Samuel P. Sears, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a judgment of the federal District Court for Massachusetts. The action is one of tort for negligence brought by Etta Podolsky, the widow of Joseph Podolsky and administratrix of his estate. The declaration contains two counts; one for the death of the plaintiff's intestate under the provisions of Mass.Gen. Laws (Ter.Ed.) c. 229, § 5, and the other for conscious suffering under the provisions of Mass.Gen.Laws, c. 229, § 6 (Ter. Ed.). The jury returned a verdict for the defendant upon which judgment was entered, and this appeal was taken.

In the assignment of errors here relied upon, the appellant complains that the court erred: (1) In the exclusion of an alleged conversation between the plaintiff and her husband; (2) in the admission of testimony on cross-examination of plaintiff's witnesses as to marks on the road at the place of the accident said to have been made by the vehicles operated by the defendant and the intestate; (3) in the admission of certain photographs taken shortly after and showing the place of the accident; and (4) in the admission of testimony descriptive of the defendant's condition on the day of the accident when he pleaded guilty to a criminal charge of negligence arising out of the accident here in question.

The plaintiff and her deceased husband resided in Dorchester, Mass., and the defendant is a resident of Manchester, N. H.

The accident occurred on North Main street in Andover, Mass., on the morning of August 20, 1934, at about 4 o'clock. At about 3 o'clock that morning, the deceased left his home to go to Lawrence, where he was employed, driving a Pontiac automobile. The defendant left Manchester early that morning for Boston, driving a truck. The parties were proceeding in opposite directions; the deceased in a northerly, and the defendant in a southerly, direction. The cars collided at about 4 a. m. near the top of a slight grade on North Main

street in Andover. Immediately after the accident the deceased was removed to a hospital in Lawrence where he was received at 4:30 a. m. and died about 1 o'clock the following morning.

The plaintiff, called as a witness in her own behalf, testified, among other things, that on the morning of the accident she arrived at the hospital in Lawrence between 7:30 and 8 o'clock and remained there until 10:30 that night; that at 12 o'clock noon, in the presence of her sister-in-law and a nurse, her husband spoke to her; that her sister-in-law was not called as a witness as she was sick in bed. And on being asked what her husband then said, counsel for the defendant objected, suggesting that the court hear the testimony in the absence of the jury and pass upon the preliminary question of its admissibility; that the evidence, if admissible at all, must answer to the provisions of section 65 of chapter 233 of the Massachusetts General Laws (Ter.Ed.), which provides:

"A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant."

A hearing apart from the jury was had before the trial judge. At that time the plaintiff was further interrogated by her counsel as to what her husband said to her at 12 o'clock noon, in the presence of her sister-in-law and the nurse, and replied that, while the nurse was there, he asked for water; that the nurse gave it to him and that he took two or three sips; that the nurse then left the room; that, after the nurse left, in the presence of her sister-in-law, she asked her husband how the accident happened; that in reply "he sort of mumbled," that "the truck was going like hell—going about like sixty." On being asked what else he said, she replied: "He mumbled something, but I couldn't hear any more." "I didn't hear him speak any more since then."

The hospital records were then submitted. The first one showed that when admitted to the ward he was unconscious; that blood was coming from his ears, the lacerations on the bridge of his nose, and his nostrils; that he was on the dangerous list; that he was being given morphia; that his pulse ranged from 104 to 116; that he had vomited a large amount of dark blood; that at 7 a. m. he seemed to regain

consciousness for a few minutes. This record was the record of the night nurse.

The second record was that of the day nurse. It stated that at 7:10 a. m. he was unconscious; that his pulse was rapid and weak, ranging from 120 to 122; that he was visited that morning by two doctors for restlessness; that at 10 a. m. he was visited by Dr. Norris; at 10:30 a. m. by Drs. Nevers and Colson; that at 10:40 he was given more morphia; that at 11:50 he was visited by Dr. Sanfagna, and at 12 noon was given morphia and hyoscine; that at 12:30 p. m. his pulse was 140, rapid and weak; that at 1:30 Dr. Sanfagna visited the patient and that he was "still unconscious."

In place of calling the doctors, two letters from Drs. Nevers and Sanfagna, written the day after his death, were put in evidence. They were both addressed to the Liberty Mutual Insurance Company, Boston, Mass. The one from Dr. Nevers, among other things, stated that 'the deceased "had a fracture of the base of the skull, a fracture of the left ramus and upper jaw, and laceration of the right cornea. Multiple lacerations and contusions" and, "except for two or three moments of semi-consciousness, unconscious all the time he was in the hospital. Gradually grew weaker until the time of his death."

The letter from Dr. Sanfagna stated that "he seemed to regain a few moments of semi-consciousness, but remained unconscious until his death. Diagnosis, fracture base of skull, fracture of left ramus, multiple abrasions and contusions."

At the conclusion of this testimony the court stated in substance that the statute required, to render a declaration competent, that it should be made in good faith and upon the personal knowledge of the declarant; that the evidence submitted raised the question "as to whether that man was in such a condition that he could have had personal knowledge of that which the witness says he did." And, in view of all the evidence, refused to find that the deceased had personal knowledge of what the witness stated he said, and declined to receive the evidence.

Here, on the one hand, it appears that the only witness in support of the making of the alleged declaration was the widow, the plaintiff in the suit, and a highly interested party; that, on the other, the records at the hospital kept by the nurses and doctors showed that Podolsky at the time he was brought to the hospital was unconscious and that he remained so substantially all the time after he was brought there and until he died. One of the hospital records further showed that at 12 o'clock, noon, the very time it is claimed that the alleged declaration was made, he was being given morphia and hyoscine. In this situation it cannot well be contended that the District Court erred in declining to find that the plaintiff had established the facts called for by the statute to render the hearsay declaration admissible. See Slotofski v. Boston Elevated Railway Co., 215 Mass. 318, 102 N.E. 417 (a similar case); Ames v. New York, New Haven & Hartford Railroad Co., 221 Mass. 304, 306, 108 N.E. 920; Bodfish v. Cross, 235 Mass. 428, 126 N.E. 655.

We find no error in this action of the court.

The next question relates to the admission of testimony, on the cross-examination of plaintiff's witnesses, as to the marks on the road at the place of the accident said to have been made by the vehicles that collided.

One Shaw, a police officer in Andover, called as a witness for the plaintiff, testified in his direct examination that he received word of the accident about five minutes past 4 o'clock, called an ambulance, and went to the scene of the accident, arriving there about ten minutes past four; that the place of the accident was North Main street, a 2-lane cement road, and he drew a plan on the blackboard showing the locus of the accident, the street car tracks on the east side of the road, and the position of the vehicles on the road; that there was no white line marking the center of the road, but that there was a tar line there; that when he arrived he found the defendant's truck on the east side of the road and the Pontiac on the same side, and indicated the position of the cars on the blackboard; that he found the intestate lying on the road about nine feet from the Pontiac bleeding and bruised, and took him to the Lawrence hospital in the ambulance; that later he returned from the hospital to the scene of the accident and had a talk with the defendant; that the defendant told him he was traveling south in the direction of Boston and that the Pontiac was headed north in the direction of Lawrence. The witness further testified there was blood on the road at the injured man's

head where he lay; that the front right end of the truck was damaged, its right front spring broken, and its right front mudguard and front headlight were damaged; that the center of the radiator of the truck bore the indentation, apparently, of the headlight of the Pontiac car; and that it was dark when he reached the place of the accident. In his direct examination he was not asked and did not testify as to whether there were or were not tire marks on the roadway. On cross-examination he was asked whether he saw something on the roadway that was not on the plan on the blackboard, and whether there was something on the diagram he had in his hand that was not on the plan, and he answered that it was not all there, that the marks of the truck coming down the street and the marks of the Pontiac were not there. At this point counsel for the plaintiff objected to the defendant's course of cross-examination on the ground that he was seeking to bring out facts not covered by the direct examination. The court ruled that the inquiry might be made and, to avoid argument as to the federal rule, it would permit the defendant to cross-examine as to the marks on the roadway in the exercise of its discretion, and the plaintiff excepted. Thereafter, the cross-examination continued and the witness testified that the rear wheels of the truck were on a portion of the cement, straight across the street pointing east; that the Pontiac was headed at about a 45-degree angle at the rear of the truck and a little south of it; that the marks made by the truck were 60 feet in length on the right-hand side of the road going towards Boston, and 3 to 5 feet from the westerly curb, and then took a very abrupt turn across the street and led up to the rear wheels of the truck; that there were marks 27 feet in length that led up to the rear of the Pontiac from the left-hand side of the road going north.

The next witness called was Leonard Saunders, also a police officer of Andover, who testified that he arrived at the scene of the accident at about 4:30 and remained there until about 5 o'clock; that the plaintiff's intestate was not there then; that there was blood on the ground three to five feet from the Pontiac in a northerly direction. He indicated on the blackboard the position of the vehicles as he found them, which was substantially where Officer Shaw said they were. On cross-examination he testified that he saw tire-marks on the road; that he did not take any measurements; and that the general location of the marks on the roadway, as Officer Shaw had placed them, was correct. No exception was taken to the testimony of this witness given on cross-examination.

Joseph Beaulieu, a witness called by the plaintiff, testified that he resided on North Main street in Andover; that the accident took place near his house; that the noise awakened him; that he went out and saw the plaintiff's intestate; that one foot was inside the car where the steering post was and his head was on the concrete part of the road to the left of the Pontiac; that the concrete part of the traveled way was about 20 feet wide. This witness did not testify on direct examination about the tire marks on the roadway. On cross-examination he was asked if he saw any marks on the road; and he said he did; that he saw tire marks on the cement portion of the road that led directly back from the wheels of the truck. On being asked if those marks were over to the west half of the cement road, counsel for the plaintiff then objected on the same ground that he did to the cross-examination of the witness Shaw. The court then ruled that in the interest of justice and progress he would exercise his discretion and admit the testimony, and the plaintiff excepted. Thereupon the witness stated that the marks from the rear of the truck led over to the west side of the road and that he saw some marks coming from the rear of the Pontiac which he could follow over onto the west side of the road.

The plaintiff contends that the testimony given by witness Shaw as to the tire marks was not the proper subject of cross-examination under the federal rule. Her contention comes to this: That, although the marks on the highway related to the condition of the road which the witness testified to in his direct examination, nevertheless, as the marks were not then specifically inquired about, it was a violation of the federal rule to bring out that testimony on cross-examination; that if the defendant wished to inquire about something constituting a part of that developed on direct examination, he should have been required to call the witness when putting in his own case so that he would be subject to cross-examination, and that

the course pursued constituted reversible error.

The evidence of this witness disclosed that in direct examination he testified that he was at the place of the accident within ten minutes after it occurred. He described the locus, how it was a 2-way road, the size of the squares of cement constituting each half of the road, and the black tar line at the center of the road between the cement squares; that there was a curbing at the west side and street railway tracks at the east side beyond the cement roadway; that the truck was on the cement roadway on the east side, pointing easterly; that the Pontiac car was a little south of the truck and pointing towards it at an angle of about 45 degrees; and that Podolsky was in the road bleeding at the head. And he made a diagram on the blackboard illustrating the scene which he had outlined in his testimony, but he failed to describe or outline on the blackboard the entire picture as he saw it at the time of his arrival at the place of the accident. The subject-matter inquired of on his direct examination was the scene or picture disclosed to him as he saw it when he arrived at the locus of the accident, and it was not a violation of the federal rule of cross-examination to have the witness disclose the entire picture as he saw it.

The witness Beaulieu testified in his direct examination as to the locus and what he found there immediately after the accident when he came out of his house. He said that the concrete part of the traveled way was about 20 feet wide; that he saw Podolsky's head on the concrete road to the left of the Pontiac; and that he was struggling to get one foot that was caught in the brake rod out of the car. He did not give as full a description of what he saw on the road at the place of the accident as the witness Shaw did, but he was questioned as to what he saw and the subject-matter of the inquiry was what he saw there right after the accident occurred. We think that his testimony on cross-examination was competent.

Furthermore, under the circumstances here disclosed, it was discretionary with the trial judge to determine the extent to which the defendant should be permitted to go in his cross-examination or be required to call the witnesses in his own behalf, and in this case he did not abuse his discretion.

The third assignment related to the introduction of two photographs, Exhibits B and C. It is claimed that no proper basis was laid for their introduction showing that they were true and fair representations of the locus at the time of the accident. But the witness through whom they were introduced testified that he was at the place of the accident within ten minutes after it occurred, and, in answer to an inquiry whether they were accurate representations of the road and the surrounding objects at the scene of the accident, he testified that they were. We find no error in the introduction of the pictures.

The last assignment relates to the admission of testimony describing the defendant's condition on the forenoon of the day of the accident when he pleaded guilty to a criminal charge of negligence that was preferred against him arising out of the same accident. The witness who gave the testimony was Officer Shaw, who preferred the charge and who was present in court at Lawrence that morning when the plea was made. On being interrogated as to what the condition of the defendant was at the time, the witness was allowed, subject to plaintiff's exception, to state that the defendant was in a nervous and upset condition; that he had been all the morning in a pretty bad condition over the accident. It was admitted by the plaintiff's counsel that about a week or so later the plea of guilty was withdrawn with the permission of the court and a plea of not guilty was entered. We think the testimony was competent.

The judgment of the District Court is affirmed, with costs in this court to the appellee.